# Exhibit G

Electronically FILED by Superior Court of California, County of Los Angeles on 06/23/2020 12:19 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
20STCV23613
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: William Fahey

MAURICE D. PESSAH (SBN: 275955)
maurice@pessahgroup.com
MICHAEL MORRIS-NUSSBAUM (SBN: 317146)
mmnussbaum@pessahgroup.com
PESSAH LAW GROUP, PC
1801 Century Park East, 26th Floor
Los Angeles, CA 90067
Telephone: (310) 772-2261

Attorneys for Plaintiff
ALEC FARWELL

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

ALEC FARWELL, an individual,

Plaintiff,

v.

NAVLAN, LLC, a Wyoming limited liability company d/b/a InboundCD; FOUNTAINHEAD MARKETING ENGINEERS, a California corporation; and DOES 1 through 100, inclusive,

Defendants.

CASE NO. 20STCV23613

**Complaint for Damages and Injunctive Relief Based On:**

1. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;**
2. **WHISTLEBLOWER RETALIATION (Cal. Lab. Code § 1102.5(b));**
3. **FAILURE TO PROVIDE EMPLOYEE PAY RECORDS (Cal. Lab. Code § 226)**
4. **FAILURE TO PROVIDE EMPLOYEE PERSONNEL FILE (Cal. Lab. Code § 1198.5)**

**DEMAND FOR JURY TRIAL**

Plaintiff Alec Farwell (“Farwell” or “Plaintiff”) brings this Complaint for damages against Defendants NAVLAN, LLC, a Wyoming limited liability company d/b/a InboundCD (“Inbound” or the “Company”); FOUNTAINHEAD MARKETING ENGINEERS (“Fountainhead”), a California corporation; and DOES 1-100, inclusive, based on the following allegations:



PLG
PESSAH LAW GROUP

## **INTRODUCTION**

1. Navlan, LLC, a Wyoming limited liability company d/b/a InboundCD ("Inbound" or the "Company") is a telemarketing company that specializes in insurance marketing. Inbound purports to distinguish itself from other telemarketers by not engaging in a controversial and legally prohibited practice known as robocalling. Inbound's professed policy, which it touts to its clients and employees, is to have a human agent on the phone with each potential customer. Inbound agents cold call members of the public to promote the services of third-party insurers. If a consumer expresses interest, he or she is transferred to an agent at a particular insurance company. Over the past two years, Inbound has developed an impressive roster of clients including, but not limited to, The Allstate Corporation ("Allstate"), a Fortune 500 company and one of America's premier insurers.

2. Plaintiff, an experienced business development professional, was recruited by Ryan Blackman ("Blackman") to manage and expand the Company's footprint in the telemarketing sector as its Director of Operations. Plaintiff was assured by Mr. Blackman that the Company adhered to applicable legal standards, and that Inbound was operating a business that was "above board." Shortly into his tenure, however, Plaintiff realized that Inbound would consistently act against its clients' interests and flout various laws in the pursuit of a quick buck.

3. Tensions began to rise when Plaintiff noticed that Inbound was using robotic technology to call people on Allstate's Do Not Call List ("Allstate DNC List") and the National Do Not Call Registry ("Federal DNC List") in a blatant violation of Allstate's policies, not to mention state and federal regulations. Time after time, Blackman and Joseph Leopold ("Leopold"), another supervisor, told Plaintiff not to raise any alarm. Yet Plaintiff continued to worry about the potential repercussions of cold-calling people who expressly refused to be contacted by representatives of Allstate or other insurers.

4. On May 1, 2020, Plaintiff was abruptly terminated from his position at Inbound. The reason given was Plaintiff's purportedly inadequate sales performance during the COVID-19 pandemic. This was a pretext, however, as Plaintiff's sales numbers actually **increased** during the



PLG
PESSAH LAW GROUP

COVID-19 lockdown. **Plaintiff also outperformed other employees during this time, including Leopold**.

5. Coincidentally (or not), Plaintiff's termination occurred shortly after an investigation was launched by Allstate into an FCC complaint filed by someone on the Allstate and Federal DNC Lists that was contacted by Inbound—the exact scenario Plaintiff had warned about. Blackman and Leopold refused to take any responsibility, blaming Plaintiff, as usual, for issues he had worked diligently to prevent.

6. Subsequent to his unlawful termination, Plaintiff requested copies of his personnel file and other employment-related documents pursuant to California Labor Code, sections 226 and 1198.5. The Company refused to abide by its obligations and failed to furnish Plaintiff with his personnel documents.

## PARTIES

7. At all times herein mentioned, Plaintiff Alec Farwell was and is an individual residing in Los Angeles, California.

8. At all times herein mentioned, Defendant Navlan, LLC was and is a Wyoming limited liability company doing business as InboundCD.

9. At all times herein mentioned, Defendant Fountainhead Marketing Engineers was and is a California corporation doing business in the State of California, County of Los Angeles.

10. Defendants Does 1 through 100, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiff. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities herein. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named defendants is the agent, servant, employee, representative, partner, and joint-venturer of their co-defendants, and so ratifies all of their acts and conduct. Therefore, each Doe Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's damages as herein alleged were proximately caused by said defendants.

11. At all relevant times, each Defendant was the agent of the other Defendants and was at all times acting within the purpose and scope of such agency. Moreover, in committing the acts

and omissions asserted herein, Defendants, and each of them, were acting in concert together, in the course and scope of their respective relationship with each other, whether as employees, agents, representatives, independent contractors, providers, service providers, as agents or representatives of each other, respectively, or as joint venturers, co-conspirators or otherwise.

**JURISDICTION**

12. Jurisdiction is proper in the Superior Court of the State of California for the County of Los Angeles pursuant to Code of Civil Procedure section 410.10, *et seq*., since at least some of the obligations, liabilities, and breaches complained of herein arose or occurred in the County of Los Angeles. Moreover, each Defendant either owns, maintains offices, transacts business, has an agent or agents within the County of Los Angeles, or otherwise is found within the County of Los Angeles, and each Defendant is within the jurisdiction of this Court for purpose of service of process.

**VENUE**

13. Venue as to each Defendant is proper in this judicial district pursuant to California Code of Civil Procedure sections 395(a) and 395.5 since at least some of the obligations, liabilities, and breaches complained of herein arose or occurred in the County of Los Angeles. Each Defendant either owns, maintains offices, transacts business, has an agent or agents within the County of Los Angeles, or otherwise is found within the County of Los Angeles, and each Defendant is within the jurisdiction of this Court for purpose of service of process.

**GENERAL ALLEGATIONS**

14. Navlan, LLC, doing business as InboundCD ("Inbound" or the "Company"), is a telemarketing company that specializes in insurance marketing. Inbound provides marketing services for various companies including Allstate, a Fortune 500 company, and one of America's premier insurers. The Company promises its clients a human face to every phone call, setting it apart from other, automated telemarketing services. Inbound agents cold-call members of the public to pitch them various insurance policies and transfer the consumer to the insurance company if interest is expressed.

15. Inbound is a subsidiary of Defendant Fountainhead Marketing Engineers ("Fountainhead"), owned and operated by Ryan Blackman ("Blackman"). Mr. Blackman oversees the operations of all companies under the Fountainhead umbrella, including Inbound.

16. Joseph Leopold ("Leopold") is the manager of QuoteFire and EXC Transfers, Fountainhead subsidiaries that also perform telemarketing services for insurers. Along with Blackman, Mr. Leopold has administrative and supervisory authority over Fountainhead's subsidiaries, including Defendant Inbound and its employees.

17. Plaintiff, an experienced business development professional, was thrilled when he was tapped by Blackman to oversee Inbound's business development. Plaintiff had previously worked for Blackman in 2013, when Plaintiff oversaw business development for Variable Marketing, a now-defunct telemarketing company Blackman had owned. At Inbound, Plaintiff's duties included cold calling potential insurance clients, managing social media, handling customer service, and conducting sales training for Allstate staff.

18. Early in his employment, Plaintiff discovered that Inbound used prohibited, robo-technology to mass-dial members of the public. One such piece of technology was Inbound's automated, multi-line robodial system, which would place dozens of automated cold calls at a time to unsuspecting consumers. Plaintiff expressed his concerns to Blackman and Leopold regarding Inbound's prohibited robodialing policies and practices, and how such policies violated Federal Communications Commission ("FCC") and Federal Trade Commission ("FTC") rules. Blackman and Leopold dismissed Plaintiff's concerns and insisted that such technology was "standard" in the telemarketing industry.

19. Inbound also used a network of "robots" to contact unsuspecting consumers, and concealed its prohibited tactics from its insurance company clients. When a call was answered, a prerecorded voice would pitch the consumer an insurance policy. Then, depending on the consumer's response, overseas phone operators would hit buttons on a switchboard to trigger additional prerecorded messages. The idea was to create the illusion that a real call agent was on the line when in fact the consumer would never speak to a human agent. This practice bothered Plaintiff, who, based on his experience in the industry, was aware of the various legal prohibitions

applicable to such practices. Plaintiff also believed the use of robots flouted FCC and FTC regulations. Yet when Plaintiff asked Blackman and Leopold about this practice, he was dismissed, verbally abused, and retaliated against.

20. For example, on or about February 25, 2020, Plaintiff advised Blackman and Leopold that Inbound's practice of calling people on Allstate's Do Not Call List ("Allstate DNC List") appeared to violate Allstate's rules and policies, as well as FCC and FTC rules. In fact, Inbound received numerous complaints from customers it had called who were on the Allstate DNC List.

21. Plaintiff also noticed that Inbound was calling people on the FTC's National Do Not Call Registry (the "Federal DNC List"). Plaintiff advised Blackman and Leopold that this practice violated federal laws, but his complaints fell on deaf ears.

22. Plaintiff's concerns were exacerbated by his knowledge of Variable Marketing ("Variable"), the now-defunct telemarketing company he worked for in 2013. Like Inbound, Variable was owned and supervised by Ryan Blackman. Sometime after Plaintiff left, Variable's persistent DNC List violations and use of robotic technology led to a consumer lawsuit against State Farm that cost State Farm millions of dollars. The lawsuit alleged that these marketing practices—which were now being perpetuated by Inbound—violated consumer protection laws. Plaintiff told Blackman and Leopold that Inbound's activities were illegal and could expose Inbound and its clients to liability. However, neither Blackman nor Leopold were receptive to Plaintiff's concerns.

23. Following Plaintiff's complaints, Blackman began berating Plaintiff about his job performance without ever giving Plaintiff the opportunity to explain himself. One source of Blackman's ire was Inbound's failure to answer calls on its service line, which Blackman blamed on Plaintiff.

24. In actuality, Plaintiff had noticed an issue with Inbound's phone line and had reported it to Inbound's IT specialist, who was working tirelessly to resolve this widespread problem. (Other Inbound employees were dealing with similar phone connectivity issues.)

However, when Plaintiff attempted to describe the corrective measures in place, Blackman refused to listen, telling Plaintiff, "i [*sic*] don't care what the fucking reason is[.]"

25. Once the Company and its leadership feared that Plaintiff may become a whistleblower, they began to target, harass and retaliate against him. Plaintiff's termination followed.

26. Another topic of Blackman's invectives was Plaintiff's sales numbers. Beginning in or around mid-March, most employees began missing sales quotas as a result of the COVID-19 pandemic. Blackman's attacks on Plaintiff were misguided, however, as Plaintiff's sales numbers steadily **<u>increased</u>** from early March until Plaintiff's termination on May 1st. In fact, Plaintiff obtained the **<u>highest 2-week sales record of any Inbound or Fountainhead employee</u>** shortly before his termination.

27. On or about April 13, 2020, Plaintiff was contacted by MaryBeth Warner ("Warner"), a Marketing Lead Consultant at Allstate. Warner was investigating an FCC complaint by a customer that Inbound had robocalled. The customer was then transferred to an Allstate agent despite being on the Allstate DNC List and Federal DNC List. Plaintiff immediately informed Blackman and Leopold of Warner's investigation, which stemmed from Inbound's violation of federal rules and Allstate's policies. Plaintiff was told to "relax" and directed to placate Ms. Warner so that the Company could plan its next move.

28. Shortly after Plaintiff was told to "relax," he was abruptly terminated on May 1, 2020. Blackman cited Plaintiff's sales numbers as the reason for the termination, despite Plaintiff outperforming other employees during the COVID-19 pandemic. It was clear that Plaintiff was terminated in retaliation for repeatedly voicing his concerns about, *inter alia*, Inbound's unethical practice of robocalling people on Allstate's DNC List and the Federal DNC List.

29. On May 13, 2020, Plaintiff sent Defendants a written demand for Plaintiff's pay records pursuant to Cal. Lab. Code § 226 and Plaintiff's employee personnel file pursuant to Cal. Lab. Code § 1198.5, *et seq*. By virtue of this demand, Defendants faced deadlines of June 3, 2020 and June 12, 2020 under Labor Code sections 226 and 1198.5, respectively, to produce the requested records.

30. Defendants did not produce Plaintiff's pay records or personnel file by the June 3, 2020 and June 12, 2020 deadlines as requested. As of this filing, Plaintiff has yet to receive these records from Defendants.

**FIRST CAUSE OF ACTION**
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
(Against All Defendants; and DOES 1-100)

Plaintiff hereby incorporates by reference Paragraphs 1 through 30 of this Complaint as though fully set forth herein and for a cause of action alleges as follows:

31. California law has a public policy against retaliation of employees. This policy is fundamental and well-established.

32. Defendants violated California's public policy when they took adverse employment action against Plaintiff based on his complaints about Inbound's unlawful and unethical business practices.

33. As alleged above, Plaintiff is informed and believes and based thereon alleges that Defendant terminated Plaintiff for retaliatory reasons after Plaintiff complained about Inbound's practices of: (1) robodialing members of the public *en masse*, (2) using prerecorded "robots" to speak to consumers, (3) calling customers on Allstate's DNC List, and (4) calling customers on the Federal DNC List.

34. By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action.

35. As a result of Defendants and their actions, Plaintiff sustained economic damages to be proven at trial. As a further result of Defendants' actions, Plaintiff suffered emotional distress, resulting in damages to be proven at trial.

36. The conduct of Defendants and its agents/employees as described herein was malicious, and/or oppressive, and done with a willful and conscious disregard for Plaintiff's rights and for the deleterious consequences of Defendants' actions. Defendants and/or their agents and

employees or supervisors authorized, condoned and ratified the unlawful conduct. Consequently, Plaintiff is entitled to punitive damages against Defendants.

**SECOND CAUSE OF ACTION**
**WHISTLEBLOWER RETALIATION**
**(Cal. Lab. Code § 1102.5(b))**
(Against All Defendants; and DOES 1-100)

Plaintiff hereby incorporates by reference Paragraphs 1 through 36 of this Complaint as though fully set forth herein and for a cause of action alleges as follows:

37. At all times herein mentioned, Cal. Lab. Code § 1102.5 was in full force and effect and fully binding upon Defendants. Cal. Lab. Code § 1102.5(b) makes it unlawful for an employer, or anyone acting on behalf of the employer, to retaliate against an employee for disclosing to someone with authority over the employee any information relating to the employer's violation of a local, state, or federal regulation.

38. Plaintiff reasonably believed that Defendant Inbound violated federal rules by: (1) robodialing members of the public *en masse*, (2) using prerecorded "robots" to speak to consumers, (3) calling customers on Allstate's DNC List, and (4) calling customers on the Federal DNC List. Plaintiff reported this practice to Defendants Blackman and Leopold in an effort to implement corrective and preventative action.

39. Defendants retaliated against Plaintiff for reporting such practices by, *inter alia*, berating Plaintiff without justification. Defendants believed and feared that Plaintiff was going to report the Company's unlawful practice to government or law enforcement agencies, and cooperate with Allstate's investigation into Defendants' practices. Defendants further took adverse employment action in retaliation against Plaintiff by terminating Plaintiff on May 1, 2020.

40. By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action. As a result of Defendants and each of their actions, Plaintiff sustained economic

damages to be proven at trial. As a further result of Defendants' actions, Plaintiff suffered emotional distress; resulting in damages to be proven at trial.

**<u>THIRD CAUSE OF ACTION</u>**

**<u>FAILURE TO PROVIDE EMPLOYEE PAY RECORDS</u>**

**(Cal Lab. Code § 226)**

(Against All Defendants; and DOES 1-100)

Plaintiff hereby incorporates by reference Paragraphs 1 through 40 of this Complaint as though fully set forth herein and for a cause of action alleges as follows:

41. At all times herein mentioned, Cal. Lab. Code § 226 was in full force and effect and fully binding upon Defendants. Labor Code § 226(a) requires employers to furnish to their employees, at regular intervals during their employment, pay records showing, *inter alia*, gross wages earned, net wages earned, deductions, and total hours worked. Cal. Lab. Code § 226(a). Labor Code § 226(b) affords "former employees the right to inspect or copy records pertaining to their employment, upon reasonable request to the employer" within 21 days of the former employees' oral or written request. Cal. Lab. Code § 226, subsections (b), (c).

42. On May 13, 2020, Plaintiff sent Defendants a written demand for Plaintiff's pay records pursuant to Cal. Lab. Code § 226. By virtue of this demand, Defendants faced a deadline of June 3, 2020 to produce the requested records.

43. Plaintiff did not receive his pay records, or any correspondence permitting inspection of the same, by the June 3, 2020 deadline.

44. As of this filing, Plaintiff has yet to receive such records from Defendants.

45. By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action. Plaintiff is further entitled to all applicable statutory penalties including, *inter alia*, those prescribed by section 226 of the California Labor Code. As a result of Defendants and each of their actions, Plaintiff has also sustained economic damages to be proven at trial.

///

///



PLG
PESSAH LAW GROUP

**<u>FOURTH CAUSE OF ACTION</u>**
**<u>FAILURE TO PROVIDE EMPLOYEE PERSONNEL FILE</u>**
**(Cal Lab. Code § 1198.5)**
(Against All Defendants; and DOES 1-100)

Plaintiff hereby incorporates by reference Paragraphs 1 through 45 of this Complaint as though fully set forth herein and for a cause of action alleges as follows:

46. At all times herein mentioned, Cal. Lab. Code § 1198.5 was in full force and effect and fully binding upon Defendants. Labor Code § 1198.5 establishes the right of a former employee "to inspect and receive a copy of the personnel records that the employer maintains relating to the employee's performance or to any grievance concerning the employee" within 30 days of the former employee's written request. Cal Lab. Code § 1198.5(b)(1).

47. On May 13, 2020, Plaintiff sent Defendants a written demand for Plaintiff's personnel file pursuant to Cal. Lab. Code §1198.5. By virtue of this demand, Defendants faced a deadline of June 12, 2020 to produce Plaintiff's personnel records.

48. Plaintiff did not receive his personnel file, or any correspondence permitting inspection of the same, by the June 12, 2020 deadline.

49. As of this filing, Plaintiff has yet to receive his personnel file from Defendants.

50. By reason of the conduct of Defendants as alleged herein, Plaintiff has necessarily retained attorneys to prosecute the within action. Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing the within action. Plaintiff is further entitled to all applicable statutory penalties including, *inter alia*, those prescribed by section 1198.5 of the California Labor Code. As a result of Defendants and each of their actions, Plaintiff has also sustained economic damages to be proven at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For compensatory damages, in an amount according to proof;
2. For all statutory penalties authorized by law;
3. For appropriate injunctive relief;


PLG
PESSAH LAW GROUP

4. For punitive and exemplary damages, as requested herein;

5. For attorney fees and costs pursuant to all applicable provisions of law;

6. For costs of suit incurred herein;

7. For prejudgment interest.

For such other relief as the court may deem proper.

PESSAH LAW GROUP, PC

Dated: June 23, 2020 By: ______________________

Maurice D. Pessah, Esq.
Michael Morris-Nussbaum, Esq.
Attorneys for Plaintiff Alec Farwell

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury.

PESSAH LAW GROUP, PC

Dated: June 23, 2020

By: ______________________

Maurice D. Pessah, Esq.
Michael Morris-Nussbaum, Esq.
Attorneys for Plaintiff Alec Farwell